**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ASKARI ABDULLAH MUHAMMAD,
F/K/A THOMAS KNIGHT,

                    Plaintiff,

vs.                                          Case No. 3:13-cv-1587-J-32JBT

MICHAEL D. CREWS, etc.; et al.,

                    Defendants.

_____

## ORDER

      Plaintiff Askari Abdullah Muhammad, formerly known as Thomas Knight, is a Florida death row prisoner who is scheduled to be executed on Tuesday, January 7, 2014.  On Monday, December 23, 2013, through counsel, he filed a Verified Complaint for Declaratory & Injunctive Relief (Doc. #1) (hereinafter Complaint) under 42 U.S.C. § 1983, alleging that his execution under Florida's recently revised lethal injection protocol[1] will violate his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.  Mr. Muhammad additionally alleges that the execution team members consistently and willfully fail to follow the written lethal injection protocol, thereby violating "Mr. Muhammad's right to equal protection because [the] DOC has arbitrarily reduced the safeguards contained in the protocol."  Complaint at 31.

_____

   [1] On September 9, 2013, the Florida Department of Corrections revised its lethal injection protocol to substitute midazolam hydrochloride for pentobarbital as the first drug in its three-drug lethal injection procedure.

This cause is before the Court on Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and/or Stay of Execution and Memorandum in Support Thereof (Doc. #4) (hereinafter Motion to Stay), filed on December 23, 2013.[2]  On Friday, December 27, 2013, Defendants, prison officials of the Florida Department of Corrections (hereinafter DOC), responded in opposition to the Motion to Stay.  See Defendants' Response to Motion for Stay (Doc. #6), filed December 27, 2013.  Because the Court finds Plaintiff has failed to demonstrate a substantial likelihood of success on the merits, his Motion to Stay will be denied.

## I.    Procedural History

On October 24, 1980, Plaintiff was indicted for the first degree murder of Correctional Officer Richard James Burke.[3]  After a trial by jury, at which Plaintiff represented himself, he was found guilty as charged.  Plaintiff waived his right to a jury for the penalty phase.  After considering the penalty phase evidence, the trial court imposed a death sentence, finding three aggravating factors and no mitigating circumstances.  On direct appeal, the Florida Supreme Court affirmed the convictions and the sentence of death.  Muhammad v. State, 494 So. 2d 969 (Fla. 1986) (per curiam), cert. denied, Muhammad v. Florida, 479 U.S. 1101 (1987).

---

[2] Plaintiff also filed Plaintiff's Motion to Proceed In Forma Pauperis (Doc. #3) and Plaintiff's Nunc Pro Tunc Motion for Appointment of Counsel Pursuant to the Criminal Justice Act (Doc. #2), which the Court will grant for purposes of this case and on appeal.

[3] At the time Correctional Officer Burke was murdered, Plaintiff was on death row for the murders of a Miami couple.  See Knight v. State, 338 So. 2d 201 (Fla. 1976) (per curiam). Plaintiff Muhammad's original name was Thomas Knight.  While imprisoned, the Plaintiff changed his name pursuant to his religious beliefs.

On February 23, 1989, Plaintiff filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850 (hereinafter 3.850 motion), which he thereafter supplemented.  On August 30, 1989, the trial court denied the motion, as supplemented, finding that all of the claims were procedurally barred because they should have been or were raised on direct appeal. Plaintiff appealed, and on June 11, 1992, the Florida Supreme Court affirmed the trial court's order with the exception of Plaintiff's Brady[4] claim.  The Florida Supreme Court remanded the case to the trial court for an evidentiary hearing on the alleged Brady violation. Muhammad v. State, 603 So. 2d 488 (Fla. 1992).

After conducting an evidentiary hearing, the trial court entered an order denying relief with respect to the guilt phase, but granting relief with respect to the sentencing phase.  Both parties appealed to the Florida Supreme Court, and Plaintiff also filed a petition for writ of habeas corpus with the Florida Supreme Court. On  August 21, 2003, the Florida Supreme Court affirmed the portion of the trial court's order denying post-conviction relief with respect to the guilt phase, reversed the portion of the order granting post-conviction relief with respect to the sentencing phase, and denied the petition for writ of habeas corpus.  State v. Knight, 866 So. 2d 1195 (Fla. 2003) (per curiam), cert. denied, 541 U.S. 1066 (2004).

Plaintiff sought habeas relief in this Court, which was denied on March 26, 2008.  See Muhammad v. McDonough, Case No.  3:05-cv-62-J-32JBT, 2008 WL 818812 (M.D. Fla. March 26, 2008).  The Eleventh Circuit Court of Appeals denied a certificate of appealability, Muhammad v.  Sec'y, Dep't of Corr., 554 F.3d 949 (11th Cir.  2009), and the United States

---

[4] Brady v.  Maryland, 373 U.S. 83 (1963).

Supreme Court denied Plaintiff's petition for writ of certiorari.  Muhammad v. McNeil, 559 U.S. 906 (2010).[5]

Florida Governor Rick Scott signed a death warrant on October 21, 2013, and scheduled Plaintiff's execution for December 3, 2013.  On October 29, 2013, Plaintiff filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.851 (hereinafter 3.851 motion) in the state circuit court, in which he raised seven claims, including essentially the same lethal injection challenge now before this Court.  The circuit court summarily denied relief on November 4, 2013.  Plaintiff appealed, and on November 18, 2013, the Florida Supreme Court entered an order: granting a stay of execution until December 27, 2013; relinquishing jurisdiction to the circuit court for the sole purpose of holding an evidentiary hearing on Muhammad's claim regarding the efficacy of midazolam hydrochloride as the first drug used in Florida's three-drug lethal injection protocol; and directing the circuit court to enter a written order as to Muhammad's claim on the efficacy of midazolam hydrochloride as an anesthetic.

The circuit court conducted an evidentiary hearing on November 21 and 22, 2013, and heard expert testimony from both parties.  On November 25, 2013, the circuit court entered an order finding that Muhammad failed to show that using midazolam hydrochloride as an anesthetic in the amount set forth in Florida's lethal injection protocol will result in a substantial risk of serious harm to Muhammad.  On December 19, 2013, the Florida

---

[5] While his federal habeas proceedings were pending, Plaintiff filed a successive motion for post-conviction relief challenging Florida's lethal injection procedures in effect at that time (July 28, 2008).  The circuit court summarily denied the motion, and the Florida Supreme Court affirmed.  Muhammad v. State, 22 So. 3d 538 (Fla. 2008).

4

Supreme Court, in Case No. SC13-2105, affirmed the circuit court's order denying post-conviction relief on the claims raised in Muhammad's 3.851 motion,[6] reversed the circuit court's order denying Muhammad's public records request to the Florida Department of Corrections for copies of his own inmate and medical records, and ordered the immediate transmission of copies of those records to Muhammad's counsel.[7]

In the SC13-2105 Order affirming the denial of Muhammad's 3.851 motion, the Florida Supreme Court provided the following summary of the testimony at the evidentiary hearing held by the circuit court.

> At the evidentiary hearing held November 21-22, 2013, Muhammad presented the testimony of Dr. Heath, a board certified anesthesiologist at the New York Presbyterian Hospital at Columbia University. In preparation for his testimony, he reviewed the revised DOC lethal injection protocol, correspondence from Hospira, news articles by reporters Farrington and Watkins, and the testimony of FDLE Inspector Feltgen concerning his observations of the Happ execution. Dr. Heath testified that midazolam hydrochloride is an FDA-approved drug in the class of drugs called "benzodiazepine." He testified that it is used in the operating room as both a pre-anesthetic and an anesthetic to cause sedation and reduce anxiety, and "in very high doses will completely ablate consciousness." In his practice, he uses the drug to make the patient less anxious. A small amount is administered for this

---

[6] Also on December 19, 2013, the Florida Supreme Court denied an Emergency Petition for Writ of Habeas Corpus filed in that court in Case No. SC13-2160 on November 13, 2013, for Muhammad's failure to state a cognizable claim. In the habeas petition, Plaintiff raised a <u>Brady</u> issue (based upon the alleged failure to disclose the contents of a sealed statement) and argued that he received ineffective assistance of trial and post-conviction counsel.

[7] As of the date of this Order, the Florida Supreme Court's December 19, 2013 Order in Case No. SC13-2105 (hereinafter SC13-2105 Order) is not available on Westlaw. Thus, this Court will cite the page numbers of the opinion that is available for viewing on the Florida Supreme Court's website at http://www.floridasupremecourt.org/decisions/opinions.

purpose, such as one milligram.  To produce a deeper level of anesthesia, Dr. Heath testified that he would give a dose of 10 or 15 milligrams, which "in [his] experience, will reliably produce a much deeper level of unconsciousness."

Dr. Heath testified that midazolam hydrochloride is generally slower to act than a barbiturate, but when successfully delivered to the brain will have full efficacy as an anesthetic. As to the duration of unconsciousness, he explained that "[i]f you give any of these drugs in a very large dose, such as the doses that are used in lethal injections, then they will all last for a very long time.  They would last for many hours."  He opined that the dosage of midazolam hydrochloride called for in the protocol, 500 milligrams, is a much larger dose than that needed to produce unconsciousness and in that amount would, with certainty, produce death.  When asked about the significance of Happ's movement that was observed during his execution in October 2013, Dr. Heath agreed that movement is not the same as consciousness and that an unconscious person may still move, although such an individual might in fact be conscious.

The State presented the testimony of Dr. Roswell Lee Evans, Jr., a pharmacist, professor of pharmacy, and Dean at Auburn University.  He testified that midazolam hydrochloride is an FDA-approved drug used for induction of general anesthesia, with a dose of 35 to 40 milligrams for minor surgeries.  Dr. Evans testified that midazolam hydrochloride is quickly absorbed into the bloodstream when introduced intravenously. If a person were given 250 milligrams, he or she would be rendered unconscious in no more than two minutes; and that the higher the dose, the longer the person will remain unconscious. He testified that the dosage called for in the lethal injection protocol, 500 milligrams given in two separate doses, would cause respiratory arrest and possibly cardiac arrest, and would render the person insensate or comatose.  He also agreed that movement by a person who was given midazolam hydrochloride would not indicate consciousness, although he would be surprised if an individual moved more than five minutes or so after its administration; but he explained that reports of Happ's movement, if observed nine minutes after administration of the drug, could have been a response to depressed respiration.

Both Dr. Heath and Dr. [Evans] agreed that the consciousness check called for in the protocol is critically important. Dr. [Evans] noted that a consciousness check using an eyelid tap, such as is done in Florida executions, is also used in surgical settings and is necessary to measure the depth of unconsciousness. Dr. Heath opined that because midazolam hydrochloride takes longer to effect unconsciousness, the Florida protocol should specify an extended period of time after administration before the consciousness check is performed.

The State also presented the testimony of FDLE Inspector Feltgen, who was an official monitor for the Happ execution. He testified that during the execution, he was located in the chemical room, standing next to the person who injected the drugs, and that he could observe the whole execution chamber through a two-way mirror. After the first syringe of midazolam hydrochloride was injected, Feltgen saw Happ breathe heavily four or five times, with his chest rising off of the table. This action may have gone on through the second syringe of midazolam hydrochloride. Feltgen observed the warden perform a consciousness check and saw no movement by Happ. Feltgen testified that Happ's execution looked very similar to the two other executions Feltgen had observed, except for Happ's heavy breathing at the beginning.

SC13-2105 Order at 23-26.

The Florida Supreme Court also provided the following summary of the circuit court's findings.

The circuit court ruled after the evidentiary hearing that, based on the testimony of both Dr. Heath and Dr. Evans, it has been established that midazolam hydrochloride is an FDA-approved drug routinely used as a pre-anesthetic and as an anesthetic in minor surgical procedures. The court found that the testimony also established that the dosage called for in Florida's three-drug lethal injection protocol, 500 milligrams, would induce not only unconsciousness, rendering the individual insensate and not in any pain, but when properly administered would ultimately cause death. The circuit court further concluded that the evidence established that even if Happ moved after administration of midazolam hydrochloride during

7

his execution in October 2013, such movement does not equate to pain.  We agree that these findings are supported by competent, substantial evidence. Further, competent, substantial evidence established that Happ's movement, reported by several news reporters whose articles were reviewed by Dr. Heath prior to his testimony, does not necessarily equate with consciousness.

In denying Muhammad's claim that the use of midazolam hydrochloride as the first drug violates the Eighth Amendment's prohibition against cruel and unusual punishment, the circuit court held that Muhammad failed to present any credible evidence that, when administered in the amount called for in Florida's lethal injection protocol, the drug is "sure or very likely to cause serious illness and needless suffering" and give rise to "sufficiently imminent dangers" under the standard set forth in the plurality decision of the United States Supreme Court in Baze v. Rees, 553 U.S. 35, 50 (2008).  The Baze decision also pointed out that the Constitution does not require the avoidance of all risk of pain in carrying out executions, id. at 47, only that it not present "the sort of 'objectively intolerable risk of harm'" that qualifies as cruel and unusual.  Id. at 50.

SC13-2105 Order at 26-28.

The Florida Supreme Court addressed Muhammad's lethal injection challenge as

follows:

The Supreme Court's plurality decision in Baze held that the petitioners in that case "have not carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol" constitutes cruel and unusual punishment.  Id. at 41.  Muhammad makes a similar claim in this case that, if not properly administered and if the individual's level of consciousness is not properly determined, the use of midazolam hydrochloride will result in severe and needless suffering when the two subsequent drugs are administered.  However, Dr. Heath agreed that the dosage of midazolam hydrochloride called for in the protocol, if properly administered together with adherence to the procedures for determining consciousness, will result in an individual who is

deeply unconscious and who would feel no pain when the remaining drugs are administered.

We reject Muhammad's invitation to presume that the DOC will not act in accordance with its lethal injection procedures adopted by the DOC.  The sufficiency of those procedures, other than the recent substitution of the midazolam hydrochloride as the first drug, were previously approved by this Court after a comprehensive evidentiary hearing in <u>Lightbourne v. McCollum</u>, 969 So. 2d 326 (Fla. 2007).  When we relinquished for an evidentiary hearing in <u>Valle</u>[8] to examine the safety and efficacy of pentobarbital, which had been substituted as the first drug in the three-drug lethal injection protocol, we reiterated that the portion of Florida's lethal injection protocol ensuring that an inmate will be unconscious prior to administration of the second and third drugs has not been altered since the protocol was approved in <u>Lightbourne</u>.  <u>Valle</u>, 70 So. 3d at 541 n.12.  Under that protocol, "he will not be injected with the final two drugs, and the execution will be suspended until Valle is unconscious."  In the instant case, as we said in <u>Valle</u>, the remainder of the protocol has not been revised.  We presume that the DOC will follow its own procedures and Muhammad will not be injected with the final two drugs until he is unconscious.

We acknowledge that, as we explained in <u>Lightbourne</u>, if the inmate is not fully unconscious when the second and third drugs, vecuronium bromide and potassium chloride, are administered, the inmate will suffer pain.  <u>See</u> <u>Lightbourne</u>, 969 So. 2d at 351.  However, we agree with the circuit court that Muhammad has not demonstrated that the conditions presenting this risk are "sure or very likely" to cause serious illness or needless suffering and give rise to "sufficiently imminent dangers" under the standard set forth in <u>Baze</u>.  Thus, we reject his constitutional challenge to the use of midazolam hydrochloride in the lethal injection procedure.  <u>See also</u> <u>Valle</u>, 70 So. 3d at 540-41 (rejecting challenge to newly-revised protocol substituting pentobarbital for the first drug in the three-drug protocol because Valle failed to show that the conditions presenting the risk must be sure or very likely to

---

[8] <u>Valle v. State</u>, 70 So.3d 530, 541 (Fla. 2011) (per curiam).

> cause serious illness and needless suffering and give rise to
> sufficiently imminent dangers).

SC13-2105 Order at 28-30 (footnotes omitted).  Following the Florida Supreme Court's

decision, Plaintiff filed this federal suit, making the same challenge to Florida's lethal injection

protocol.

## II.    Discussion

In this Circuit:

> A stay of execution is equitable relief which this Court
> may grant only if the moving party shows that: (1) he has a
> substantial likelihood of success on the merits; (2) he will suffer
> irreparable injury unless the injunction issues; (3) the stay would
> not substantially harm the other litigant; and (4) if issued, the
> injunction would not be adverse to the public interest. DeYoung
> v. Owens, 646 F.3d 1319, 1324 (11th Cir. 2011) (internal
> quotation marks omitted).

Valle v. Singer, 655 F.3d 1223, 1225 (11th Cir. 2011) (per curiam), cert. denied, 132 S.Ct.

73 (2011).  If Muhammad cannot satisfy his burden of demonstrating a substantial likelihood

of success as to at least one of his claims, his motion must be denied.  See Ferguson v.

Warden, Fla. State Prison, 493 F. App'x 22, 26 (11th Cir. 2012) (per curiam); Valle v. Singer,

655 F.3d at 1225.

Additionally, in Baze v. Rees, 553 U.S. 35 (2008) (plurality opinion), after concluding

that the State of Kentucky's three-drug lethal injection protocol did not violate the Eighth

Amendment prohibition against cruel and unusual punishment, a plurality of the Court

opined:

> A stay of execution may not be granted on grounds such as
> those asserted here unless the condemned prisoner establishes
> that the State's lethal injection protocol creates a demonstrated

10

> risk of severe pain.  He must show that the risk is substantial when compared to the known and available alternatives.  A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.

Id. at 61.

### A.    Substantial likelihood of success on the merits

#### 1.    Statute of Limitations

"[A] method of execution claim accrues on the later of the date on which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol." Mann v. Palmer, 713 F.3d 1306, 1312 (11th Cir. 2013) (citing McNair v. Allen, 515 F.3d 1168, 1174 (11th Cir. 2008)).  Muhammad's state review was complete on February 23, 1987, when the Supreme Court of the United States denied his petition for a writ of certiorari to the Supreme Court of Florida on direct appeal. Muhammad's conviction was final before Florida adopted lethal injection as its method of execution in 2000.  Thus, absent a substantially changed execution protocol, the statute of limitations for Muhammad to raise a lethal injection challenge expired on February 13, 2004. See Mann, 713 F.3d at 1312 ("[t]he statute of limitations for challenges to the adoption of lethal injection as the method of execution in Florida began to run on February 13, 2000, and expired on February 13, 2004") (citing Henyard v. Sec'y, Dep't of Corr., 543 F.3d 644, 647 (11th Cir. 2008)).

The Eleventh Circuit Court of Appeals has repeatedly held that "Florida did not make a significant change in its lethal injection protocol when it substituted pentobarbital for sodium pentothal" as the first drug in the three drug protocol.  Mann, 713 F.3d at 1313 (citing

Valle v. Singer, 655 F.3d at 1233); see also Pardo v. Palmer, 500 F. App'x 901, 904 (11th Cir. 2012) (per curiam) ("we have explicitly held that changes to the first and second drugs in the three-drug sequence do 'not constitute a substantial change'" for the purpose of restarting the statute of limitations) (quoting Ferguson, 493 F. App'x at 24). Here, too, the DOC has substituted one anesthetizing drug for another as the first drug in the three-drug protocol. No other changes were made to the lethal injection protocol. Moreover, the testimony of both Dr. Heath and Dr. Evans at the evidentiary hearing in state court establishes that midazolam hydrochloride is routinely used as a pre-anesthetic and as an anesthetic in minor surgical procedures, and that the 500 milligram dosage called for in Florida's lethal injection protocol would not only induce unconsciousness, but would ultimately cause death. Thus, the substitution of midazolam hydrochloride for pentobarbital does not constitute a substantial change to the execution protocol within the meaning of Eleventh Circuit precedent. Therefore, Muhammad has not shown a substantial likelihood of success on the merits of his claims because it appears that they are barred by Florida's four-year statute of limitations.[9]

### 2. Mr. Muhammad's Eighth Amendment claim

Muhammad claims Florida's three-drug lethal injection protocol will subject him to an unnecessary risk of serious pain and suffering in violation of the Eighth Amendment's

---

[9] In addition to the statute of limitations, there are additional bases upon which Mr. Muhammad's claims may be barred (such as the doctrine of res judicata and Muhammad's failure to exhaust his administrative remedies). See Defendants' Response to Motion for Stay at 1-6. However, due to the serious nature of the issues raised by Muhammad and that this is a capital case, the Court will address Mr. Muhammad's claims on the merits and pretermit determination of these other contentions.

proscription against cruel and unusual punishment.  Florida's protocol, most recently amended on September 9, 2013, calls for the serial intravenous administration of the following three chemical substances:   500 milligrams of midazolam hydrochloride, an anesthetic; followed by 100 milligrams of vecuronium bromide, a neuromuscular blocking agent or paralytic; followed by 240 milliequivalents of potassium chloride, which causes cardiac arrest and death.  See Ex.[10] A (Execution by Lethal Injection Procedures, dated September 9, 2013).

Muhammad's Eighth Amendment challenge relates to the use of midazolam hydrochloride as the first drug in the three-drug protocol.  Specifically, he contends that midazolam hydrochloride is a short-acting benzodiazepine, and that benzodiazepines are a class of drugs which are primarily used for treating anxiety.  He asserts that midazolam hydrochloride is not a barbiturate, as were pentobarbital and sodium thiopental, the two drugs that have previously been used as the first drug in Florida's three-drug protocol. Plaintiff alleges the effects of midazolam hydrochloride do not last as long as other benzodiazepines, and that its efficacy is of much shorter duration than the barbiturates previously used as the first drug in the three-drug protocol.  Additionally, Plaintiff argues that midazolam hydrochloride is not fast-acting and takes much more time than the previously used barbiturates to render the condemned inmate unconscious.  Plaintiff states that "[t]he decision to experiment with an untested benzodiazepine instead of a barbiturate for the

---

[10]  The Court hereinafter refers to the exhibits appended to the Complaint as "Ex."

purpose of inducing anesthesia represents a substantial change to the protocol; one that warrants discovery, investigation, and judicial review." Complaint at 8.

Plaintiff asserts that, after substituting midazolam hydrochloride for pentobarbital, DOC officials did not adjust the protocol to include a specific length of time that the appropriate official should or must wait before performing the consciousness check. Moreover, Plaintiff contends that the consciousness check set forth in the protocol is inadequate. Accordingly, he claims that "[t]he failure to adjust the protocol to include an adequate consciousness check creates a substantial risk of harm to Mr. Muhammad because he will be injected with an agonizing paralytic without it being determined that he had reached an anesthetic depth necessary to be insensate." Id. at 29.

> Mr. Muhammad submits that Florida's three drug lethal-injection protocol, as described in the Execution by Lethal Injection Procedures document, calls for (i) the use of an insufficient, improperly designed, and improperly administered procedure for inducing and maintaining loss of consciousness and sensation prior to execution; and (ii) the use of chemicals that cause severe pain in the process of causing death, in conjunction with chemicals used specifically and for no other purpose than to mask that severe pain, such that there is a substantial risk that Mr. Muhammad will suffer serious harm in violation of his right to be free from cruel and unusual punishment under the Eight Amendment to the United States Constitution.

> The three-drug lethal injection protocol employed by the State of Florida does not comport with "evolving standards of decency that mark the progress of a maturing society," as demonstrated by the fact that thirteen states across the country have adopted or announced that they will adopt a single-drug protocol that does not pose the substantial risks of serious harm that are present in Florida's three drug protocol.

> Moreover, the multitude of experiences that states now have had with single drug executions - where condemned

14

> inmates have died without apparent complication using a large dose of a barbiturate without administration of a paralytic or potassium chloride - demonstrates that the substantial risks of severe pain presented by Florida's three drug protocol are objectively intolerable and readily avoidable.

Id. at 33-34 (paragraph enumeration omitted).

The Eleventh Circuit has explained that to state an Eighth Amendment claim, a plaintiff must establish that "(1) the State is being deliberately indifferent (2) to a condition that poses a substantial risk of serious harm to [the inmate]." Valle v. Singer, 655 F.3d at 1225.  In particular, in the lethal injection context, an inmate must "show an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." Id. (quoting DeYoung v. Owens, 646 F.3d at 1319, 1325 (11th Cir. 2011)).

As noted by the Supreme Court, "speculation cannot substitute for evidence" that the use of midazolam hydrochloride is "'sure or very likely to cause serious illness and needless suffering.'" Brewer v. Landrigan, 131 S.Ct. 445 (2010) (quoting Baze, 553 U.S. at 50); Baze, 553 U.S. at 50 (noting that, simply because an execution method may accidentally result in pain does not establish the sort of objectively intolerable risk of harm necessary to establish an Eighth Amendment violation); Valle v. Singer, 655 F.3d at 1233 ("mere speculation cannot substitute for evidence that the use of pentobarbital will or very likely will cause serious illness and needless suffering").

"In the lethal injection context, 'the condemned inmate's lack of consciousness is the focus of the constitutional inquiry.'" Valle v. State, 70 So. 3d 530, 539 (Fla. 2011) (per curiam) (quoting Ventura v. State, 2 So. 3d 194, 200 (Fla. 2009) (per curiam), cert. denied,

15

129 S.Ct. 2839 (2009)), cert. denied, 132 S.Ct. 1 (2011).  The Florida protocol requires that

the execution team confirm that the inmate is unconscious after administration of the first

drug, midazolam hydrochloride; thus if done correctly, there is no substantial risk of harm

from administration of the second and third drugs.  See Baze, 553 U.S. at 49 ("proper

administration of the first drug, sodium thiopental, eliminates any meaningful risk that a

prisoner would experience pain from the subsequent injections of pancuronium and

potassium chloride").

Plaintiff argues that the members of the execution team do not wait long enough for

the midazolam hydrochloride to fully anesthesize the inmate before administering the second

drug; however, he has not presented evidence to substantiate that claim.  At Muhammad's

evidentiary hearing in state court, Dr. Evans testified that the dosage of midazolam

hydrochloride used in Florida's protocol would render an individual unconscious within "one

and a half to two minutes."  Ex. L at 7.  Dr. Evans opined that, after the midazolam

hydrochloride rendered the individual unconscious, he "wouldn't be aware of any sensation."

Id. at 8.  Dr. Evans stated that midazolam hydrochloride is faster acting in inducing

unconsciousness than the previously used pentobarbital, with pentobarbital taking

approximately three to four minutes to induce unconsciousness.  Id. at 22-23.

Plaintiff's expert, Dr. Heath, testified that when he uses much smaller doses of

midazolam hydrochloride to anesthesize patients, "it usually takes probably a minute or two

to begin to take effect."  Ex. C at 113.  He testified that there are many variables that have

an impact on the time the drug takes to render an individual unconscious; however, it could

take "a minute" to travel from the "vein-to-brain."  Id. at 113-14.  Dr. Heath never specifically

16

addressed how long it would take for the amount of midazolam hydrochloride used in Florida's protocol to render an inmate unconscious.  And, while Dr. Heath opined that, based on the Happ execution, the consciousness check after administering the midazolam hydrochloride was inadequate and therefore subjected Plaintiff to a "substantial risk of harm," Ex. C at 128, that opinion was not well enough supported to convince the state circuit court, the Florida Supreme Court or this Court, especially in light of other testimony of Dr. Heath himself and the testimony of Dr.  Evans.

In support of his claim that the second drug is administered before the first drug renders the inmate unconscious, Plaintiff points to the testimony of Inspector Feltgen, who stated that the second drug was administered almost immediately after the first drug during the Happ execution.  See Complaint at 23-24 (summarizing the pertinent testimony of Agent Feltgen).  Plaintiff made this same argument in state court, and the Florida Supreme Court rejected it for the following reasons:

> We reject Muhammad's characterization of the testimony of FDLE agent Feltgen, which Muhammad contends shows that the paralytic drug was injected only thirty seconds after the first injection of midazolam hydrochloride in the Happ execution, in violation of the protocol.  A full reading of Feltgen's testimony, and his recounting of the steps that were followed in the Happ execution, demonstrate that the DOC followed its protocol in injecting two syringes of midazolam hydrochloride and a third syringe of saline, and that only after the consciousness check was performed and unconsciousness determined was Happ injected with vecuronium bromide.

SC13-2105 Order at 28-29 n.12.  This Court agrees that a full review of Agent Feltgen's testimony supports a finding that the second drug was administered only after the

17

consciousness check was performed and prison officials determined Happ was unconsciousness.

Plaintiff also contends that midazolam hydrochloride does not adequately anesthesize an inmate prior to administration of the second drug as evidenced by movements inmate Happ allegedly made after the midazolam hydrochloride was administered and after the consciousness check had been performed during his execution.  See Complaint at 8-9. However, Dr. Evans testified that if Happ breathed deeply and moved his head after the consciousness check had been performed, that would be "very consistent with the impact of Midazolam on the central nervous system." Ex. L at 21.  Dr. Evans also testified that "it's possible for that to occur as a result of the body's compensation for respiratory depression caused by the drug." Id. at 20.  Even Plaintiff's own expert, Dr. Heath, testified that it is possible to be unconscious and still move. Ex. C at 136.

In addressing this issue, the Florida Supreme Court stated:

> The circuit court further concluded that the evidence established that even if Happ moved after administration of midazolam hydrochloride during his execution in October 2013, such movement does not equate to pain.  We agree that these findings are supported by competent, substantial evidence. Further, competent, substantial evidence established that Happ's movement, reported by several news reporters whose articles were reviewed by Dr. Heath prior to his testimony, does not necessarily equate with consciousness.

SC13-2105 Order at 27.  There is no evidentiary or legal basis for this Court to disagree with this finding.[11]   Plaintiff's unsupported speculation to the contrary "cannot substitute for

---

[11] While this Court would be empowered to conduct its own evidentiary hearing on this issue, there is no reason to believe the evidence would be different.

evidence that the use of [midazolam hydrochloride] will or very likely will cause serious illness and needless suffering." Valle v. Singer, 655 F.3d at 1233.

Plaintiff also alleges that the consciousness check mandated by Florida's lethal injection protocol is insufficient.  This Court, in Valle v. Singer, Case No. 3:11-cv-700-J-34TEM, found that Florida's protocol requires a consciousness check after the administration of the first drug, and prior to the administration of the second drug of the three-drug protocol, and that the execution "cannot proceed until the individual is rendered unconscious." Valle v. Singer, 655 F.3d at 1233.  This Court will not revisit this issue, and will, like the Florida Supreme Court, "presume that the DOC will follow its own procedures and Muhammad will not be injected with the final two drugs until he is unconscious."  SC13-2105 Order at 29.

Thus, Plaintiff has not shown a substantial likelihood of success on the merits of his Eighth Amendment claim with respect to the use of midazolam hydrochloride as the first drug in the three-drug protocol.  He has not shown that the use of midazolam hydrochloride in his upcoming execution is "sure or very likely to cause serious illness and needless suffering." Baze, 553 U.S. at 50.

Finally, with respect to Plaintiff's claim that the three-drug protocol is no longer tolerable under the Eighth Amendment given the existence and increasingly widespread use of the one-drug protocol, the Court also finds that Plaintiff has not shown a substantial likelihood of success on the merits of this claim.[12]  In Baze, the Supreme Court instructed

---

[12]  Plaintiff's claim that the three-drug protocol presents unnecessary risks of pain and suffering may be time barred as the suit was filed well beyond the four-year limitations period; however, the Court will address the merits of this claim.

that: "Given what our cases have said about the nature of the risk of harm that is actionable

under the Eighth Amendment, a condemned prisoner cannot successfully challenge a State's

method of execution merely by showing a slightly or marginally safer alternative." Id. at 51.

As such, the Court clarified the showing necessary for an Eighth Amendment violation:

> Permitting an Eighth Amendment violation to be established on such a showing would threaten to transform courts into boards of inquiry charged with determining "best practices" for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology. Such an approach finds no support in our cases, would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures - a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death. See Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government").

Id.

> In rejecting a similar claim and citing Baze, the Third Circuit stated:

> We recognize that the one-drug protocol is gaining support as an alternative to the three-drug lethal injection protocol, and we commend those states steadily striving to develop more humane alternatives to existing methods of execution. However, federal courts are not "boards of inquiry charged with determining 'best practices' for executions." Baze, 553 U.S. at 51, 128 S.Ct. 1520.

Jackson v. Danberg, 656 F.3d 157, 165 (3rd Cir. 2011). Thus, Plaintiff cannot successfully

challenge Florida's three-drug protocol by contending that the one-drug protocol may be a

better option for Florida.  Baze, 553 U.S. at 51.  Instead, Plaintiff must first show that

Florida's current protocol creates a "demonstrated risk of severe pain," id. at 61; this he has

not done.  Plaintiff has also not shown that "the risk [of the three-drug protocol] is substantial when compared to the known and available alternatives."  Id.  Accordingly, Plaintiff has not shown a substantial likelihood of success on the merits of this claim.

### 3. Mr. Muhammad's Fourteenth Amendment equal protection claim

Mr. Muhammad additionally alleges that the execution team members consistently and willfully fail to follow the written protocol, thereby violating "Mr.  Muhammad's right to equal protection because [the] DOC has arbitrarily reduced the safeguards contained in the protocol."  Complaint at 31.  "To state an equal protection claim, [Plaintiff] must show that the State will treat him disparately from other similarly situated persons." DeYoung, 646 F.3d at 1327 (citing Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1180 (11th Cir. 2009)). However, under Florida's current lethal injection protocol, "all death row inmates facing execution will be subject to the same sequence of drugs, the same procedures, and the same safeguards in the execution process."  Ferguson, 493 F. App'x at 26.  Id.  Mr. Muhammad has failed to point to any evidence that he would be treated differently from any other death row inmate subject to this protocol, nor has he demonstrated anything more than the abstract possibility that prison officials will fail to follow the protocol in his case.  He therefore has failed to demonstrate a substantial likelihood of success as to his Fourteenth Amendment equal protection claim.

### B. Remaining prongs of the standard

Because the Court has found that Mr. Muhammad cannot demonstrate a substantial likelihood of success as to either his Eighth or Fourteenth Amendment claims, he cannot

21

prevail on his Motion to Stay, and the Court therefore need not determine whether any of the remaining three factors weigh in his favor.  See Valle, 655 F.3d at 1225.

## III.  Conclusion

This is one of a series of cases challenging Florida's lethal injection protocol which this Court has considered.  The Court has ongoing concerns about Florida's seemingly constantly changing lethal injection protocol, the lack of explanation by the State of the need for these changes, and the State's lack of transparency in administering the protocol. However, these concerns do not rise to the level of a sustainable constitutional challenge at this time, given the record in this case and preexisting Eleventh Circuit precedent on the lethal injection issue.[13]

Accordingly, it is hereby

**ORDERED**:

1.    Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and/or Stay of Execution (Doc. #4) is **DENIED**.

2.    Plaintiff's Motion to Proceed In Forma Pauperis (Doc. #3) and Plaintiff's Nunc Pro Tunc Motion for Appointment of Counsel Pursuant to the Criminal Justice Act (Doc. #2) are **GRANTED**.

3.    The Clerk shall telephonically notify counsel for the parties of the entry of this Order.

---

[13] The Court has made this ruling based on the record and procedural posture of this case.  The Court currently has before it several other cases, still in their infancy, challenging Florida's lethal injection protocol.  The Court's decision in this case is not intended to prejudge those cases.

22

4.       The Clerk shall immediately notify the following capital case points of contact of this Order: (1) the United States Court of Appeals for the Eleventh Circuit; (2) the Governor's Office in Tallahassee, Florida; (3) the Secretary of the Florida Department of Corrections; (4) the Warden of Florida State Prison; and (5) the Attorney General's Office in Tallahassee, Florida.

5.       The Clerk shall immediately provide by email a copy of this Order to the Warden of Florida State Prison who shall immediately provide a copy of this Order to Mr. Muhammad.

**DONE AND ORDERED** at Jacksonville, Florida this 27th day of December, 2013.

_____
TIMOTHY J. CORRIGAN
United States District Judge

ps 12/27
c:
Counsel of Record